ORAL ARGUMENT NOT YET SCHEDULED

# No. 22-5281

---

# United States Court of Appeals
# for the District of Columbia Circuit

---

AMERICAN OVERSIGHT,

*Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 17-827
The Hon. Emmet G. Sullivan

---

## BRIEF FOR APPELLANT AMERICAN OVERSIGHT

---

Katherine M. Anthony
Mehreen A. Rasheed
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-3918

Jessica Anne Morton
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org

February 13, 2023

*Counsel for Plaintiff-Appellant*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies the following:

### A.    Parties and Amici

Plaintiff in the district court, and appellant here, is American Oversight.  Defendants in the district court, and appellees here, are the United States Department of Health and Human Services and the Office of Management and Budget.  In the district court, the Committee on Ways and Means of the United States House of Representatives intervened on behalf of the defendants; the Committee has informed this Court, however, that it will not participate in this appeal.  There were no other parties, intervenors, or amici before the district court, and no intervenors or amici have appeared in this Court to date.

### B.    Ruling Under Review

Appellant American Oversight seeks review of the May 27, 2022 Memorandum Opinion and Order issued by the Honorable Emmet G. Sullivan in *American Oversight* v. *U.S. Department of Health and Human Services et al.*, Case No. 17-827 (D.D.C.), which adopted in part and rejected in part the Report and Recommendation issued by Magistrate

Judge Deborah A. Robinson on August 10, 2018, as well as the August 26, 2022 Final Judgment incorporating Judge Sullivan's Memorandum Opinion and Order. The May 27, 2022 Order is reproduced at JA 568–69. The May 27, 2022 Memorandum Opinion is reproduced at JA 570–639; it is not yet published in a reporter but is also available at 2022 WL 1719001. The August 26, 2022 Final Judgment is reproduced at JA 647–48. The August 10, 2018 Report and Recommendation is reproduced at JA 487–513.

## C.    Related Cases

This case has not previously been before this Court or any other court (other than the district court below). Counsel for American Oversight are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Date: February 13, 2023       Respectfully submitted,

*/s/ Jessica Anne Morton*

Jessica Anne Morton
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org

Katherine M. Anthony
Mehreen A. Rasheed
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-3918
katherine.anthony@americanoversight.org
mehreen.rasheed@americanoversight.org

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellant American Oversight certifies that it does not have parent corporations, and that no publicly held corporation has a 10% or greater ownership interest in American Oversight.

Date: February 13, 2023          Respectfully submitted,

*/s/ Jessica Anne Morton*
Jessica Anne Morton
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org

Katherine M. Anthony
Mehreen A. Rasheed
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-3918
katherine.anthony@americanoversight.org
mehreen.rasheed@americanoversight.org

*Counsel for Plaintiff-Appellant*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant American Oversight respectfully requests oral argument in this case. This case presents the question of whether certain communications between congressional staff and executive agencies fall under the "consultant corollary" to Exemption 5 of the Freedom of Information Act. Because this issue is likely to recur—and indeed is already the subject of a split within the district, *compare American Oversight* v. *U.S. Dep't of Health & Human Services*, 380 F. Supp. 3d 45 (D.D.C. 2019), *with American Oversight* v. *U.S. Dep't of Treasury*, 474 F. Supp. 3d 251 (D.D.C. 2020), *and American Oversight* v. *U.S. Dep't of Transportation*, Case No. 18-1272, 2022 WL 103306 (D.D.C. Jan. 11, 2022)—oral argument would aid the Court in rendering its decision.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
        CASES ...................................................................................i

CORPORATE DISCLOSURE STATEMENT ..........................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................v

TABLE OF AUTHORITIES .................................................................viii

GLOSSARY ...........................................................................................xii

INTRODUCTION.....................................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES...............................................................3

PERTINENT STATUTES ........................................................................4

STATEMENT OF THE CASE ..................................................................5

        A.    Statutory Background.............................................................5

        B.    Procedural History .................................................................6

SUMMARY OF ARGUMENT .................................................................15

STANDARD OF REVIEW......................................................................17

ARGUMENT ..........................................................................................17

I.    THE CONGRESSIONAL COMMUNICATIONS AT ISSUE
      ARE NOT EXEMPT FROM FOIA DISCLOSURE.......................17

        A.    The Supreme Court has established limitations on the
              consultant corollary doctrine ..............................................18

        B.    The communications at issue do not fall within the
              consultant corollary doctrine of this Circuit........................24

II.    HHS FAILED TO CONDUCT AN ADEQUATE SEARCH ........... 39

CONCLUSION ......................................................................... 46

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*American Oversight* v. *Office of Management & Budget*,
Case No. 18-2424, 2020 WL 1536186 (D.D.C. Mar. 31,
2020) .................................................................................. 41

*American Oversight* v. *U.S. Dep't of Health & Human
Services*,
380 F. Supp. 3d 45 (D.D.C. 2019) ....................................... 26

*American Oversight* v. *U.S. Dep't of Transportation*,
Case No. 18-1272, 2022 WL 103306 (D.D.C. Jan. 11, 2022) .............. 26

*American Oversight* v. *U.S. Dep't of Treasury*,
474 F. Supp. 3d 251 (D.D.C. 2020) .................................... 26

*American Oversight* v. *U.S. General Services Administration*,
Case No. 18-2419, 2020 WL 1911559 (D.D.C. Apr. 20,
2020) ........................................................................ 41, 44, 45

*Ancient Coin Collectors Guild* v. *U.S. Dep't of State*,
641 F.3d 504 (D.C. Cir. 2011) ............................................. 39

*Bagwell* v. *U.S. Dep't of Justice*,
311 F. Supp. 3d 223 (D.D.C. 2018) ..................................... 40

*Buckley* v. *Valeo*,
424 U.S. 1 (1976) ............................................................... 27

*Citizens for Responsibility & Ethics in Washington* v. *U.S.
Dep't of Justice*, 746 F.3d 1082 (D.C. Cir. 2014) ................ 18

_____

* Authorities upon which American Oversight chiefly relies are marked
with asterisks.

*Citizens for Responsibility & Ethics in Washington* v. *U.S. General Services Administration*, Case No. 18-377, 2018 WL 6605862 (D.D.C. Dec. 17, 2018) .................................................. 41

***Dep't of the Interior* v. *Klamath*,**
532 U.S. 1 (2001) ...................................1, 15, 17–24, 29–30, 32–36, 38

*Dow Jones & Co., Inc.* v. *Dep't of Justice*,
917 F.2d 571 (D.C. Cir. 1990) ............................................................. 38

*Environmental Protection Agency* v. *Mink*,
410 U.S. 73 (1973)................................................................................ 32

*Food Marketing Institute* v. *Argus Leader Media*,
139 S. Ct. 2356 (2019)......................................................................... 19

*Government Accountability Project* v. *U.S. Dep't of Homeland Security*, 335 F. Supp. 3d 7 (D.D.C. 2018).................................... 40, 41

*Jobe* v. *National Transportation Safety Board*,
1 F.4th 396 (5th Cir. 2021) ................................................................. 23

*Judicial Watch, Inc.* v. *U.S. Dep't of Justice*,
20 F.4th 49 (D.C. Cir. 2021) .............................................................. 17

*Lucaj* v. *Federal Bureau of Investigation*,
852 F.3d 541 (6th Cir. 2017)............................................................... 24

*McGehee* v. *CIA*,
697 F.2d 1095 (D.C. Cir. 1983) .................................................... 40, 42

*McKinley* v. *Board of Governors of the Federal Reserve System*,
647 F.3d 331 (D.C. Cir. 2014) ................................................. 24–25, 36

*Milner* v. *Dep't of Navy*,
562 U.S. 562 (2011)................................................................................ 5

*National Institute of Military Justice* v. *U.S. Dep't of Defense*,
512 F.3d 677 (D.C. Cir. 2008) .......................................... 25, 33, 35, 36

ix

*Public Citizen, Inc.* v. *Dep't of Justice*,
    111 F.3d 168 (D.C. Cir. 1997) ...................................................... 22, 33

**\*Public Employees for Environmental Responsibility** v. *U.S.*
    *Section, International Boundary & Water Commission,*
    *U.S.-Mexico,* 740 F.3d 195 (D.C. Cir. 2014) ............ 1–2, 24, 28, 31, 33

*Rojas* v. *Federal Aviation Administration*,
    989 F.3d 666 (9th Cir. 2021) (en banc) ............................................... 23

*Ryan* v. *Dep't of Justice*,
    617 F.2d 781 (D.C. Cir. 1980) .................................... 22, 34, 35, 36, 39

*SafeCard Services, Inc.* v. *SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ........................................................ 43

*Tigue* v. *U.S. Dep't of Justice*,
    312 F.3d 70 (2d Cir. 2002) ............................................................... 24

*Truitt* v. *Dep't of State*,
    897 F.2d 540 (D.C. Cir. 1990) ........................................................ 40

*Utahamerican Energy, Inc.* v. *Mine Safety & Health*
    *Administration,* 725 F. Supp. 2d 78 (D.D.C. 2010) ........................... 40

*Weisberg* v. *U.S. Dep't of Justice*,
    745 F.2d 1476 (D.C. Cir. 1984) ........................................................ 39

## Statutes

5 U.S.C. § 551(1)(A) ................................................................. 5, 18

5 U.S.C. § 552 ........................................................................ 4, 5

5 U.S.C. § 552(b)(5) ......................................................... 3, 4, 5, 18

28 U.S.C. § 1291 ......................................................................... 3

28 U.S.C. § 1331 ......................................................................... 3

**Constitutional Provisions**

U.S. Const. art. II, § 3 ................................................................ 34

**Regulations**

48 C.F.R. § 9.505 ..................................................................... 20

**Other Authorities**

The Federalist No. 51 (James Madison) ................................... 27

# GLOSSARY

| | |
|---|---|
| ACA* | Affordable Care Act |
| AHCA* | American Health Care Act |
| FOIA | Freedom of Information Act |
| HHS | U.S. Department of Health and Human Services |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |

---

\* American Oversight notes that, in compliance with Circuit Internal Procedure IX(a)(8)(d), it uses the acronyms "ACA" and "AHCA" in this brief only when quoting specific search terms that were used in this FOIA matter. Because the distinction between a search term using the acronym and a search term using the full title of the statute forms the crux of one of the disputes at issue, this limited use of these acronyms is necessary here.

**INTRODUCTION**

The government seeks to withhold from Freedom of Information Act disclosure certain communications between Executive Branch agencies and Congress relating to efforts to repeal and replace the Affordable Care Act—on the theory that Members of Congress and their staff were acting as mere "consultants" to the co-equal Branch, in a manner "just as an employee would be expected to do." *Dep't of the Interior* v. *Klamath*, 532 U.S. 1, 11 (2001). But this application of the "consultant corollary" doctrine would stretch it past the breaking point.

The consultant corollary doctrine—the standards for which are "hotly debated," JA 607—permits agencies, in certain circumstances, to withhold documents created by an outside consultant when the records are part of the agency's deliberative process. More than twenty years ago, however, the Supreme Court noted the ways in which the consultant corollary doctrine had exceeded statutory limitations and set guardrails for the outer limits of the doctrine. *Klamath*, 532 U.S. at 12. As a result, this Court has made clear that the consultant corollary applies only in "situations where an outside consultant did not have its own interests in mind." *Public Employees for Environmental Responsibility* v. *U.S.

1

*Section, International Boundary & Water Commission, U.S.-Mexico*, 740 F.3d 195, 201–02 (D.C. Cir. 2014) (Kavanaugh, J.) (referencing *Klamath*). In their efforts to pass health care reform legislation, Members of Congress and their staff surely had their "own interests in mind," and not merely the interests of the U.S. Department of Health and Human Services and the Office of Management and Budget. In holding otherwise, the district court below effectively expanded the scope of the consultant corollary doctrine, leaving behind an unworkable test and opening the door for agencies to withhold an increasing volume of external communications in violation of the principle that FOIA exemptions be narrowly construed. This Court should decline the government's invitation to follow down that path.

HHS additionally failed to conduct an adequate FOIA search in the first place. In conducting a search for communications related to "health care reform," HHS refused to search for common synonyms of the search terms it employed, such as "Obamacare" and "repeal and replace." Although an agency is not required to include every possible search term, it is required under this Court's precedent to prove that it has conducted a search reasonably calculated to uncover all relevant documents.

Declining to employ obvious search terms, without sufficient explanation, cannot meet that standard.

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. § 1331.  That court entered its final judgment on August 26, 2022, JA 647, and American Oversight timely appealed on October 25, 2022, JA 649.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the U.S. Department of Health and Human Services and Office of Management and Budget improperly withheld communications between agency personnel and Members of Congress and congressional staff under the "consultant corollary" to Exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5).

2.     Whether the U.S. Department of Health and Human Services failed to conduct an adequate search for records responsive to American Oversight's FOIA request where it refused to search for commonly used synonyms.

3

## PERTINENT STATUTES

The relevant provisions of the Freedom of Information Act, 5 U.S.C.

§ 552, state:

    (a)    Each agency shall make available to the public information as

    follows: . . .

    (3)(A) . . . each agency, upon any request for records which (i)

    reasonably describes such records and (ii) is made in

    accordance with published rules stating the time, place, fees

    (if any), and procedures to be followed, shall make the records

    promptly available to any person. . . .

    (b)    This section does not apply to matters that are . . .

    (5)    inter-agency or intra-agency memorandums or letters

    that would not be available by law to a party other than

    an agency in litigation with the agency, provided that

    the deliberative process privilege shall not apply to

    records created 25 years or more before the date on

    which the records were requested . . . .

The relevant statutory provisions providing definitions for the Freedom of Information Act, 5 U.S.C. § 551, state:

For the purpose of this subchapter—

(1)  "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

A.    the Congress . . . .

## STATEMENT OF THE CASE

### A.    Statutory Background

The Freedom of Information Act, 5 U.S.C. § 552, generally requires federal agencies to make their records available to the public upon request.  FOIA contemplates only nine exemptions from disclosure.  At issue here is Exemption 5, which permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5, like the others, "must be narrowly construed."  *Milner* v. *Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted).  It contains two components:  a threshold requirement that the documents qualify as

5

"inter-agency" or "intra-agency," and then a determination of whether a substantive privilege, such as attorney-client privilege, work product privilege, or—relevant here—the deliberative process privilege, applies.

## B.  Procedural History

In March 2017, Republicans in the House of Representatives introduced a set of bills—the American Health Care Act—intended to repeal and replace the Affordable Care Act.  A few weeks later, American Oversight, a nonprofit, nonpartisan organization focused on the promotion of transparency in government, submitted substantively identical FOIA requests for records related to health care reform to the Department of Health and Human Services and the Office of Management and Budget.  As relevant here, American Oversight sought communications, talking points, and other material "exchanged between [HHS or OMB, respectively] and any Members of Congress or congressional staff relating to health care reform."  JA 32, 40.

Failing to receive a substantive response from either HHS or OMB, American Oversight filed suit under FOIA.  JA 17.  The district court ordered HHS and OMB to review and produce responsive records on a rolling basis.  JA 6 (May 25, 2017 Minute Order).  Once the productions

were complete, American Oversight noted several deficiencies: first, the produced records from both HHS and OMB were extensively redacted under claims of deliberative process privilege pursuant to Exemption 5, although many of these records covered communications between the agencies and congressional staff, and thus did not qualify as "inter-agency" or "intra-agency" communications. And second, HHS had used only three search terms in its efforts to locate responsive documents: "health care reform," "ACA," and "AHCA."[1]

Unable to resolve these disputes, the parties filed cross-motions for summary judgment.[2] HHS and OMB produced several declarations providing the basis for their decision to withhold communications under Exemption 5. OMB provided a declaration from then-Associate Director

---

[1] American Oversight identified other issues, such as the improper redaction of calendar entries, which were resolved below.

[2] In the district court, the Committee on Ways and Means of the U.S. House of Representatives intervened as a defendant to argue that a handful of documents constituted "congressional records" and should not be produced by the agencies. The district court ultimately found the Committee's motion for summary judgment on that issue to be moot, JA 568, and the question is not before this Court on appeal. The Committee has therefore informed this Court that it will not participate in the appeal. *See* Mot. to Withdraw as Counsel, Doc. No. 1980279, at 2 (Jan. 5, 2023).

7

for Legislative Affairs Jonathan Slemrod, JA 107, who stated that "[t]he communications involving OMB at issue . . . were exchanged between individuals in the current [Trump] administration and Republican Members of Congress and their staff, all of whom shared the common goal of enacting the [American Health Care Act], or legislation closely paralleling that bill." JA 109 ¶ 7. According to Mr. Slemrod, "OMB relied on the informal channel of email communications to enable its officials and staff to receive information from Congress that was used to advise the President about health care reform." JA 110 ¶ 10. Mr. Slemrod stated that "deliberations in support of an eventual final recommendation" as to the actions the President should take with regard to a given bill "are ongoing as the bill is being developed by Congress, and advice is given to the President at many points before final passage." *Id.* ¶ 9. Mr. Slemrod described a spectrum of OMB roles, including the preparation of Statements of Administration Policy, coordinating and harmonizing stakeholders' views, debating potential strategies for passing legislation in Congress, and providing technical assistance to Congress in drafting legislation. JA 110–14. OMB therefore "sought to influence and shape pending legislation by discussing, consulting, and

negotiating with Congressional personnel," including by providing "answers to specific questions about how programs operate." JA 114–15 ¶¶ 18, 20.

HHS produced a declaration from Kristin Skrzycki, then-Deputy Chief of Staff for then-HHS Secretary Tom Price, JA 203, and one from Sarah Arbes, then-Principal Deputy Assistant Secretary for Legislation, JA 208. Ms. Skrzycki stated that the communications at issue "were exchanged between individuals who shared the common goal of enacting health care reform legislation," and that the communications "included policy proposals and strategic discussions that informed [HHS's] process in deciding between administrative options and adjusting technical assistance provided to Congress." JA 207 ¶ 20. Ms. Arbes specified that the communications at issue "informed HHS' decision-making about potential administrative initiatives," such as identifying potential HHS rulemakings that might become necessary, ensuring that technical assistance was "responsive to the needs of congressional staff," and "communicat[ing] effectively with external stakeholders and the media." JA 209–10 ¶ 8. All three declarants attested to their belief that the

expectation of confidentiality enabled candid discussions over e-mail.  JA 115–17 ¶¶ 19–24; 206–07 ¶¶ 19–20; 210 ¶¶ 9–10.

As to the adequacy of the search, HHS produced a declaration stating that it chose only the three search terms identified above "because the request sought records relating to 'health care reform,'" and that "[u]sing the abbreviated versions of [ACA and AHCA] made sense to [the HHS component] because they are frequently used in the day-to-day operations of the Department, as opposed to the unabbreviated versions, and were therefore reasonably likely to locate responsive records."  JA 122 ¶ 16.  The declarant further stated that "[i]t is reasonably likely that the use of more general terms would have resulted in an excessive number of records that would have been labeled 'potentially responsive,' which the FOIA Office would have had to review and process, without a meaningful increase in the likelihood of identifying additional records that were actually responsive."  *Id.*

The district court referred the matter to a Magistrate Judge, who issued a report and recommendation on August 10, 2018.  JA 487.  The Magistrate Judge granted in part and denied in part the agencies' motion

for summary judgment and denied American Oversight's cross-motion for summary judgment.

As to the communications between the agencies and congressional staff, the Magistrate Judge determined that withholding was appropriate under Exemption 5. JA 500–04. The Magistrate Judge applied Exemption 5's "consultant corollary," which permits agencies to withhold documents in certain situations where the agencies have sought advice from outside consultants who effectively take the role of agency employees. JA 500–01. The Magistrate Judge found that OMB and HHS had solicited advice from the congressional staff, and that the congressional staff was not self-interested in providing that advice. JA 501–04. In the Magistrate Judge's view, the relevant focus here was not the policy process within a single agency, but rather the interest of the federal government as a whole across both branches: "Congress members' interests here are not . . . adverse to the interests of the government, they *are* the interests of the government—in both Congress and the Executive—as evidenced by their consultant relationship." JA 502–03 (emphasis in original).

Having found that the communications qualified as "intra-agency," the Magistrate Judge next determined that the communications mostly fell within the deliberative process privilege because "they were provided for the purpose of developing agency understanding of the legislative status of health care reform in Congress for use in the production of agency materials."  JA 507.

The Magistrate Judge also determined that HHS's search was adequate.  JA 493–95.  Although HHS had submitted a declaration stating only that the search terms it employed were "frequently used in the day-to-day-operations" of HHS, JA 122 ¶ 16, the Magistrate Judge found that "HHS conducted its searches using what it perceived to be a reasonable set of search terms (the *most commonly* used references) that would turn up the requested documents," and that American Oversight had "not presented significant evidence to suggest that other documents could be found that do not contain one of the search terms used," JA 495 (emphasis added).

Following the submission by both parties of objections to the report and recommendation, the district court issued a memorandum opinion and order on May 27, 2022.  JA 568, 570.  The court adopted in part and

rejected in part the report and recommendation, granting summary judgment to OMB and HHS on the issues relevant here. JA 569.

The district court held that the communications between the agencies and congressional staff fell within the consultant corollary and were thus subject to Exemption 5. JA 604–08. The court held that the consultant corollary "would only be inapplicable" if the interests of the congressional staff and agencies were "(1) necessarily adverse; and (2) the members were competitors" for the same limited benefit. JA 609 (citation omitted). The district court believed that the "common interest" in passing health care reform legislation sufficed to invoke the corollary, *id.*, given the court's view that "Congress members were not providing advice in their own self-interest," JA 612 (internal quotation marks and citation omitted). As to American Oversight's argument that Members had the interests of their constituents in mind, the court responded that Members "may be solicited for advice by agencies *precisely because* they will advocate for their constituencies in the process of working with the Executive Branch on the common goal of passing legislation, and thereby aid the agency's process." JA 610–11 (emphasis in original). The court also found that OMB and HHS had solicited these communications—

even where certain e-mails demonstrated that Congress sought the agencies' advice, instead of the reverse.  JA 615–18.

The court next held that the documents fell within the deliberative process privilege.  JA 618–28.  As above, the court relied on what it deemed the "intertwined nature of congressional and Executive Branch decision making," JA 620, and found that the "iterative process of drafting legislation . . ., while aiding Congress . . . [is] also relevant to the Executive Branch's own decision making," JA 624–25.[3]

The district court also determined that HHS's search was adequate.  JA 600–04.  Reviewing the Magistrate Judge's opinion for clear error, the court "conclude[d] there is nothing unreasonable in HHS choosing to search the most common forms of reference used in the day-to-day operations of the Department."  JA 603 (internal quotation marks and citation omitted).  The court stated that "HHS is not required to assert that other terms were not also used, or even that all of the other proposed

---

[3] The district court did order the agencies to release any redacted information that is both factual in nature and segregable from the deliberative portion of documents.  JA 626–28.  In the interest of conserving agency resources, American Oversight agreed to forgo this segregability review; if American Oversight prevails on the consultant corollary question in this appeal, its right to disclosure would subsume those documents.  *See* JA 641.

14

terms were used less frequently." *Id.* (internal quotation marks and citation omitted). The court also noted a "lack of significant evidence to suggest that other documents could be found that do not contain one of the search terms used." JA 603–04 (internal quotation marks and citations omitted).

Because the district court also ordered additional production and a supplemental declaration on issues not presently before this Court, final judgment did not issue until August 26, 2022. JA 647. American Oversight timely appealed on October 25, 2022. JA 649.

## SUMMARY OF ARGUMENT

I. OMB and HHS bear the burden of establishing that the communications they seek to withhold from production under FOIA Exemption 5 are "intra-agency." They cannot meet that burden. The agencies seek to withhold communications with Congress— definitionally, communications that are not "intra-agency." Although this Court has developed the "consultant corollary" doctrine to permit the withholding of some communications with individuals outside of the agency itself, the doctrine does not extend this far. As the Supreme Court made clear in *Klamath*, and this Court has reiterated in its post-*Klamath*

holdings, the consultant corollary cannot shield documents prepared by outside "consultants" who are acting in their own, or someone else's, interest. Members of Congress and their staff, who are part of an independent branch of government and are elected and hired specifically to represent the interests of their constituents, generally fall beyond the outer limits of this doctrine. The government's efforts to expand this doctrine beyond the existing case law would do violence to the statutory text, contradict the Supreme Court's teachings, and violate the established principle that FOIA exemptions must be construed narrowly.

II.     HHS also bears the burden of demonstrating that its search was reasonably calculated to locate all documents responsive to American Oversight's FOIA request for communications relating to "health care reform." HHS cannot meet that burden either. As numerous courts have explained, agencies must search for obvious synonyms in an effort to capture all responsive documents. But here, HHS searched only "health care reform," "ACA," and "AHCA"—refusing to include self-evident alternatives such as "Affordable Care Act," "American Health Care Act," "Obamacare," and "repeal and replace." HHS fails to demonstrate that these additional search terms are unlikely to result in

the location of additional responsive documents, particularly given that American Oversight has introduced evidence that the alternative search terms were regularly used by both agency staff and their congressional interlocutors.

## STANDARD OF REVIEW

This Court reviews questions of law—including a district court's decision to grant summary judgment—de novo. *See Judicial Watch, Inc.* v. *U.S. Dep't of Justice*, 20 F.4th 49, 54 (D.C. Cir. 2021).

## ARGUMENT

## I.  THE CONGRESSIONAL COMMUNICATIONS AT ISSUE ARE NOT EXEMPT FROM FOIA DISCLOSURE

"FOIA mandates disclosure of records held by a federal agency, unless the documents fall within enumerated exemptions." *Klamath*, 532 U.S. at 7 (citations omitted).  "These limited exemptions," however, "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act," and so "these exemptions have been consistently given a narrow compass."  *Id.* at 7–8 (internal quotation marks, citations, and alteration omitted).

FOIA's Exemption 5 permits agencies to withhold from disclosure "inter-agency or intra-agency memorandums or letters that would not be

available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This encompasses two conditions: first, the document's "source must be a Government agency," and second, "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. The first of these conditions is at issue in this appeal.

"The agenc[ies] bear[] the burden of establishing that a claimed exemption applies." *Citizens for Responsibility & Ethics in Washington* v. *U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). The government fails to meet its burden here.

## A. The Supreme Court has established limitations on the consultant corollary doctrine.

As the Supreme Court explained in *Klamath*, "the first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra-agency.'" 532 U.S. at 9 (quoting 5 U.S.C. § 552(b)(5)). Here, of course, although HHS and OMB are agencies, the documents at issue are communications with Congress. And Congress is explicitly excluded from the statutory definition of "agency" for FOIA purposes. *See* 5 U.S.C. § 551(1)(A). As a matter of plain textual

18

interpretation, then, this would ordinarily be an open-and-shut case. *See Klamath*, 532 U.S. at 9 ("Statutory definitions underscore the apparent plainness of this text.").[4]   Thus, as a matter of literal meaning, communications with Congress cannot be "intra-agency" or "inter-agency."

A number of lower courts, however, including this one, have developed a narrow exception, known as the "consultant corollary," for when outside individuals advise the agency in its deliberative processes. In those instances, "the exemption extends to communications between Government agencies and outside consultants hired by them." *Id.* at 10. "[T]he fact about the consultant that is constant in the typical cases is that the consultant *does not represent an interest of its own, or the interest*

---

[4] The Supreme Court recently applied the same principle when interpreting the language of FOIA's Exemption 4. *See Food Marketing Institute* v. *Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).   In the 1970s, this Circuit had determined that the textual requirement that a document be "confidential" to be withheld under Exemption 4 required a determination that disclosure would risk substantial competitive harm, although "substantial competitive harm" does not appear within the statutory text and is not within the ordinary meaning of "confidential." *Id.   Argus Leader* dispensed with this decades-old line of cases, explaining that "[i]n statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.   Where, as here, that examination yields a clear answer, judges must stop." *Id.* (internal citations omitted).

*of any other client*, when it advises the agency that hires it.  Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do."  *Id.* at 10–11 (emphasis added).[5]

In *Klamath*, the Supreme Court was asked to address the application of the consultant corollary to documents between certain Indian Tribes and the Department of the Interior regarding "tribal interests subject to state and federal proceedings to determine water allocations."  *Id.* at 4.  In a unanimous opinion, the Court declined to endorse the consultant corollary, noting the textual tension described above.  *Id.* at 12.  Instead, the Court held that—even if some consultants' reports might plausibly qualify as "intra-agency"—the same could not be true for the communications at issue, where certain Tribes "necessarily communicate with the Bureau [of Indian Affairs] with their own, albeit entirely legitimate, interests in mind."  *Id.*

---

[5] The regulations governing the actual consultants for government agencies—paid federal contractors—are instructive here.  Consistent with *Klamath*, regulations are aimed at the "two underlying principles" of "[p]reventing the existence of conflicting roles that might bias a contractor's judgment" and "[p]reventing unfair competitive advantage." 48 C.F.R. § 9.505.

The Court contrasted such self-interested communications with those of consultants who "have not been communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant," a "distinction . . . even sharper, in that the Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* But "[e]ven if there were no rival interests at stake . . . the Klamath Tribe *would be pressing its own view of its own interest* in its communications with the Bureau." *Id.* at 14 (emphasis added). The Court did not need to reach the question of the validity of the consultant corollary as a general principle (or its precise contours), because "the dispositive point is that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors." *Id.*

The *Klamath* Court addressed this Court's consultant corollary cases in a footnote, acknowledging that this Court has "recognized at least two instances of intra-agency consultants that arguably extend beyond what we have characterized as the typical examples." 532 at 12

21

n.4 (citing *Public Citizen, Inc.* v. *Dep't of Justice*, 111 F.3d 168 (D.C. Cir. 1997) and *Ryan* v. *Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980)).  As to *Public Citizen*, the Court noted that former Presidents were treated as intra-agency consultants in communications with the National Archives and Records Administration, "even though the Presidents had their own, independent interests."  532 U.S. at 12 n.4.  And as to *Ryan*, the Court explained that "Senators' responses to the Attorney General's questionnaires about the judicial nomination process were held exempt, even though we would expect a Senator to have strong personal views on the matter."  *Id.*  The Court explained, however, that it "need not decide whether either instance should be recognized as intra-agency, even if communications with paid consultants are ultimately so treated," because "the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants."  *Id.*

In issuing its ruling, the Court was unmoved by the government's arguments that its interest in frank communications and a desire to avoid a chilling effect is by itself sufficient to conclude that communications are "inter-agency or intra-agency."  *Id.* at 11.  *Klamath*

22

accepted, without "any doubt," "the Government's assertion that the candor of . . . communications . . . would be eroded without the protections of the deliberative process privilege recognized under Exemption 5." *Id.* But the Court rejected the government's invitation to "infer a sufficient justification for applying Exemption 5" from "the recognition of this interest in frank communication." *Id.* Doing so "skips a necessary step, for it ignores the first condition of Exemption 5, that the communication be 'intra-agency or inter-agency.'" *Id.* at 12. And, the Court explained, "[t]here is . . . no textual justification for draining the first condition of independent vitality." *Id.*

In the wake of *Klamath*, other courts of appeals have confirmed that *Klamath* "provides helpful guidance" in "distill[ing] general principles" that "define the outer boundaries of Exemption 5's reach": that is, the outside consultant "'functions just as an employee would be expected to do'" and represents no interest of its own or any other client. *Rojas* v. *Federal Aviation Administration*, 989 F.3d 666, 674–75 (9th Cir. 2021) (en banc) (quoting *Klamath*, 532 U.S. at 10–11); *see also Jobe* v. *National Transportation Safety Board*, 1 F.4th 396, 407 (5th Cir. 2021) ("To be sure, *Klamath* contains language suggesting that self-interest of some

kind may prevent outside experts from being deemed consultants. Whatever that threshold might be, however, it has not been reached here." (internal citation omitted)); *Tigue* v. *U.S. Dep't of Justice*, 312 F.3d 70, 78 n.2 (2d Cir. 2002) (distinguishing its case from *Klamath*, as the plaintiffs had not argued that the purported consultant was an interested party).[6]  The Sixth Circuit has gone even further, suggesting that *Klamath* entirely forecloses the consultant corollary as a matter of textual interpretation.  *See Lucaj* v. *Federal Bureau of Investigation*, 852 F.3d 541, 548–49 (6th Cir. 2017).

## B.    The communications at issue do not fall within the consultant corollary doctrine of this Circuit.

As this Court has explained, "[i]n the wake of *Klamath*, we have confined the consultant corollary to situations where an outside consultant did not have its own interests in mind."  *Public Employees for Environmental Responsibility*, 740 F.3d at 201–02.  For instance, in *McKinley*, the FOIA requester argued that the Board of Governors of the Federal Reserve System failed to demonstrate that its purported

---

[6] American Oversight is not aware of any court of appeals cases that have expressly limited *Klamath*'s application only to situations where multiple claimants competed for the same limited resource.

consultant—the Federal Reserve Bank of New York—shared its interests. *McKinley* v. *Board of Governors of the Federal Reserve System*, 647 F.3d 331, 336 (D.C. Cir. 2014).  This Court held, however, that the Federal Reserve Bank of New York "did not represent an interest of its own, or the interest of any other client, when it advised the Board" because it was admittedly an "operating arm" of the Board itself.  *Id.* at 337 (internal quotation marks, citation, and alterations omitted). Likewise, in *National Institute of Military Justice*, this Court found that the lawyers from whom the Department of Defense had solicited recommendations as to the establishment of military commissions to try international terrorists "*were not pursuing interests of their own* so as to run afoul of *Klamath*'s concern."  *National Institute of Military Justice* v. *U.S. Dep't of Defense*, 512 F.3d 677, 685 (D.C. Cir. 2008) (emphasis added).

Applying that test to the congressional communications at issue here, which relate to efforts to pass certain legislation, requires a different result.  OMB and HHS—which bear the burden—have not produced any evidence that the congressional staff with whom the agencies communicated did not have their own interests in mind.  *Cf.*

*American Oversight* v. *U.S. Dep't of Health & Human Services*,[7] 380 F. Supp. 3d 45, 53 (D.D.C. 2019) (rejecting HHS and OMB's Exemption 5 claim because their "declarations in support of their motion for summary judgment . . . do not address whether the outside consultants – the Congressional representatives and staffers – advised the agencies in a self-interested manner or whether their only obligations were to truth and a sense of what good judgment calls" (internal quotation marks, citation, and alterations omitted)).[8]  Nor could they.  It would strain credulity to argue that Members of Congress—elected specifically to represent their constituents' interests—and their staff had no self-interest apart from the agencies'.  On the contrary, our system of

---

[7] Although the case cited here involves the same parties and similar public records requests, it is indeed a separate matter from the instant appeal.  Although the government noticed an appeal in the case cited here, the government moved to voluntarily dismiss its appeal before briefing.  *See* Appellants' Motion to Dismiss Appeal, *American Oversight* v. *U.S. Dep't of Health & Human Services*, Case No. 19-5163 (D.C. Cir. Oct. 16, 2019).

[8] *But see American Oversight* v. *U.S. Dep't of Treasury*, 474 F. Supp. 3d 251, 266–67 (D.D.C. 2020) (holding that communications between congressional staff and Treasury regarding the Trump tax reform initiative fell within the consultant corollary because they worked together toward a common goal); *American Oversight* v. *U.S. Dep't of Transportation*, Case No. 18-1272, 2022 WL 103306, at *5 (D.D.C. Jan. 11, 2022) (similar).

government assumes that Congress and its Members have independent interests in representing their constituents, their re-election, and their standing within their party, as well as many other considerations. *See, e.g.*, *Buckley* v. *Valeo*, 424 U.S. 1, 124 (1976) ("The principle of separation of powers was not simply an abstract generalization in the minds of the Framers . . . ."), *superseded by statute*, Bipartisan Campaign Reform Act of 2002, 116 Stat. 81, *as recognized in McConnell* v. *Federal Election Comm'n*, 540 U.S. 93, 122 (2003); The Federalist No. 51 (James Madison) (describing the importance of "opposite and rival interests" in "giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others").

Far from negating that structural component of our federal government, the agencies assert, at most, that the Members with whom they communicated "shared the common goal of enacting health care reform legislation." JA 207 ¶ 20; *see also* JA 109 ¶ 7. But this does not address the question of the Members' other interests. Indeed, the agencies' statement that they were "negotiating with Congressional personnel" themselves suggests that the agencies and Congress—let alone individual Members and their constituents—were not completely

aligned.[9]    JA 115 ¶ 20.    Moreover, simply agreeing on the broadest possible definition of an overarching goal does not address the core problem associated with bias:  that someone with a vested interest in an outcome is more likely to present a one-sided view, whether intentionally or not.

The district court erred in finding otherwise.    First, the court misconstrued the relevant test.    The court held that the consultant corollary is "only . . . inapplicable" if the interests of the congressional staff and agencies were "(1) necessarily adverse; and (2) the members were competitors."    JA 609 (citation omitted).    But this is not the test articulated by this Circuit.    *See Public Employees for Environmental Responsibility*, 740 F.3d at 201–02 ("In the wake of *Klamath*, we have

_____

[9] This concern is particularly salient in the context of health care reform. For example, legislators from a state that has expanded Medicaid would have different interests than legislators from a state that has not, and would seek different benefits for their constituents.  Moreover, federal health care funding is a finite resource, and so benefits conferred on one state or district could disadvantage the constituents of another.

confined the consultant corollary to situations where an outside consultant did not have its own interests in mind.").[10]

Second, the court erred in finding that a general "common interest" in passing health care reform legislation sufficed to overcome any self-interest or interest on the behalf of constituents. *See* JA 610–12.[11] The district court's belief that congressional staff acted within the consultant corollary "*precisely because* they will advocate for their constituencies in the process of working with the Executive Branch," JA 610–11 (emphasis in original), cannot carry the day after *Klamath*.[12] Members of Congress

---

[10] Although *Klamath* acknowledged that "the dispositive point" in that case was "that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors," 532 U.S. at 13, this language established a ceiling, not a floor. *See id.* at 12 n.4 ("[T]he intra-agency condition excludes, *at the least*, communications to or from an interested party seeking a Government benefit at the expense of other applicants." (emphasis added)).

[11] The district court also noted a dearth of "case law that requires the advice of different consultants [here members of Congress] to be *aligned* with each other." JA 610 (emphasis and brackets in original). But American Oversight does not argue that the *advice* of various consultants must be aligned; rather, the consultants must not have their own *interests* in mind.

[12] Indeed, the district court's conclusion that agencies may seek Members' advice for that very reason, JA 610–11, begs the question. An agency's motivation for seeking self-interested advice does not somehow render

do not "function[] just as an employee would be expected to do." 532 U.S. at 11. Rather, they and their staff are necessarily independent actors who serve the interests of their constituents and have their own interests in re-election. The fact that those independent interests may sometimes coincide at a high level with an agency's interest does not turn Members of Congress or their staffs into the equivalent of agency employees.[13]

Precisely because Members of Congress have independent interests, the rule adopted by the district court would be fundamentally unworkable: a "common interest" in reforming health care or in any other legislative proposal is both over- and under-inclusive. If HHS had asked for the opinion of a Member who was vocally opposed to the idea of repealing and replacing the Affordable Care Act, that Member's views would obviously be informed by a desire to thwart the administration's

---

that advice disinterested. Moreover, a test premised on the fact of the agency's desire for external input would conceivably apply to every communication an agency would seek to withhold under the consultant corollary doctrine—rendering it no test at all.

[13] Moreover, a common interest—to the extent one exists—cannot be properly defined at the high level of abstraction proposed by the district court. It is not enough to simply say that both branches of government want what is best for their constituencies, or for the American people, as the same could be said of the Department of the Interior and the Indian Tribes in *Klamath*.

plans. Would that communication be subject to FOIA disclosure, while communications with other Members on the same issue would be withheld? Beyond that, there are increasing difficulties with each level of nuance: the Member who is a Republican but opposing the new bill; the Member who is a Democrat, but in a swing district; the Member who is on board with the overall project of the American Health Care Act, but who is bent on ensuring that a provision of particular interest to her constituents (although not the administration) receives support from the Executive Branch; the Member who very much desires to reform health care (but by moving to a single payer system). Parsing through these situations is intrinsically fraught when the supposed "consultants" exist for the very purpose of advocating for the interests of their own constituents.

At the same time, a categorical rule—stating that all congressional communications fall under the consultant corollary—would go far beyond the proper scope of the consultant corollary doctrine, as this Court and others have construed it. *See Public Employees for Environmental Responsibility*, 740 F.3d at 201–02. It defies logic to suggest that a co-equal branch of government is "enough like the agency's own personnel

to justify calling their communications intra-agency." *Klamath*, 532 U.S. at 12. Such a rule would likewise be inconsistent with *Klamath*, where the Court found that a fiduciary interest was insufficient to merge the Tribe and the Bureau. *Id.* at 14. If a fiduciary interest is insufficiently identical to overcome the potential for differences of position, then the mere "common goals" articulated by the agencies, *see* JA 109 ¶ 7; 207 ¶ 20, and relied upon by the district court, JA 609, could hardly suffice.

And if the mere coincidence of a "common interest" between independent actors brought an otherwise interested party within the consultant corollary, then there is no reason that private groups with a meaningful stake in the outcome of such legislation (such as the healthcare industry itself, or advocacy organizations created for the express purpose of undoing the Affordable Care Act) could not be shielded by the consultant corollary as well. This result would undermine not only *Klamath* and this Court's teachings, but also the long-standing principle that FOIA is "broadly conceived." *Environmental Protection Agency* v. *Mink*, 410 U.S. 73, 80 (1973), *superseded by statute on other grounds*, 5 U.S.C. § 552(b)(1), *as recognized in CIA* v. *Sims*, 471 U.S. 159, 189 n.5 (1985) (Marshall, J., concurring).

In the proceedings below, the government relied heavily on this Court's pre-*Klamath* precedent for the proposition that consultations across branches of government can fall within the consultant corollary. But this Court has articulated its post-*Klamath* test: whether an outside consultant "did not have its own interests in mind." *Public Employees for Environmental Responsibility*, 740 F.3d at 201–02. And the government cannot meet that test.

Beyond that, although this Court has recognized that its prior "precedent is not inconsistent with *Klamath*," *National Institute of Military Justice*, 512 F.3d at 680, neither of the cases on which *Klamath* cast doubt control here. In *Public Citizen*, this Court held that communications between former presidents and the National Archives and Records Administration fell within the consultant corollary. *Public Citizen*, 111 F.3d at 172. Although, as *Klamath* recognizes, "Presidents had their own, independent interests" in access to their presidential records, 532 U.S. at 12 n.4, this Court found two distinguishing characteristics in issuing its ruling. First, the Court explained that former presidents retain the authority to assert their executive privilege over Presidential communications. *Public Citizen*, 111 F.3d at 170. And

second, their consultative relationship with the National Archives and Records Administration is "not only explicit, . . . but is mandated by statute." *Id.* In other words, the consultation is required, which is not the case here.[14]

In *Ryan*, President Carter had tasked the Attorney General with evaluating the selection processes for district court judges, including whether an effort had been made to find qualified candidates among women and minority groups. 617 F.2d at 784. The Attorney General sent Senators a questionnaire about their procedures for recommending nominees, including questions about the process by which they identified candidates, how each candidate met the President's criteria, and the demographic make-up of any nominating commission used. *Id.* at 791. This Court held that the non-factual portions of the questionnaire responses were exempt from FOIA disclosure under the consultant corollary. *Id.* As the Supreme Court acknowledged, "we would expect a Senator to have strong personal views on the matter." *Klamath*, 532 U.S.

---

[14] To the extent the agencies in this case would invoke the Recommendations Clause, U.S. Const. art. II, § 3, it provides no assistance: although there is a textual requirement for the President to provide recommendations for the consideration of Congress, there is no textual requirement that Congress return the favor.

at 12 n.4. But "strong personal views" are not coextensive with "interests" in the way that term is used by *Klamath* and the cases following it.[15]

In any event, *Ryan* differs factually from the case at hand. In *Ryan*, the Attorney General sent the questionnaire at issue to every Senator. 617 F.2d at 784. The questionnaire asked precisely the same information of all Senators, across party lines, in order to advise the President of the methodology behind their recommendations for judicial candidates. Although the Senators in *Ryan* likely did have strong views on their own recommendations, the questionnaires were not aimed at uncovering those views, but rather the bases for them, and the process by which they were derived. This is a far cry from the situation at hand, where only some, but not all, congressional staff held a privileged position with HHS and OMB, and their "consultation" likely went well beyond a description

---

[15] For example, the non-governmental lawyers who provided advice to the Department of Defense on the establishment of military commissions surely had personal views on the topic. But this Court noted that "there is no dispute" that these lawyers "were not pursuing interests of their own so as to run afoul of *Klamath*'s concern." *National Institute of Military Justice*, 512 F.3d at 685.

35

of the process used to arrive at the American Health Care Act.[16]  If *Ryan* was at the outer bounds for the *Klamath* Court, the government's argument here traverses well beyond them.[17]

What's more, the evidence there is on the instant question shows that there were no "indicia of a consultant relationship" between the agencies and congressional staff in this case.  *National Institute of Military Justice*, 512 F.3d at 686.  In *Ryan*, the Attorney General had clearly solicited the questionnaire responses at issue.  617 F.2d at 790; *see also, e.g.*, *McKinley*, 647 F.3d at 338 (requiring the agency to show it solicited the material at issue from the alleged consultant).  Here,

---

[16] Moreover, because Senators provide recommendations for district court vacancies only within their own state—and the two Senators for each state share the exact same constituency—there is less concern that the documents at issue in *Ryan* would implicate the divergence of interests we see within the Legislative Branch in the course of passing legislation.

[17] In *National Institute of Military Justice*, this Court noted that "the extent to which either *Ryan* or *Public Citizen may* have extended Exemption 5 beyond its permissible scope based on their peculiar facts is an issue we need not and do not decide here."  512 F.3d at 685 (emphasis in original).  As explained above, American Oversight does not believe that this Court need reach that issue here, either, as the government effectively seeks an *extension* of *Ryan*.  If, however, this Court were to determine that *Ryan* alone governs this question, en banc review would be appropriate to determine whether *Ryan* should be abandoned in light of *Klamath*.

36

however, the documents reflect back-and-forth negotiations between the agencies and congressional staff—including, in some instances, solicitations by *congressional staff* for assistance and input from the *agencies*. As OMB's declaration explained, the agency "sought to influence and shape pending legislation," including by "negotiating with Congressional personnel." JA 115 ¶ 20; *see also id.* at 114 ¶ 18 (describing OMB's "commenting on draft legislative language" and providing Congress with "answers to specific questions about how programs operate"); JA 206 ¶ 16 ("HHS engaged with Congress to monitor and build support for the AHCA."); JA 208 ¶ 3 ("I assist congressional staff with their own work and advance the Trump Administration's health and human services interests before Congress.").

These declarations demonstrate not only that the agencies and congressional staff held independent interests, but also that the agencies were trying to influence or assist Congress—not always the other way around. *See* JA 466 (entry 46) (describing a withheld e-mail exchange as "summarizing Executive Branch views on health care in advance of

37

health care vote").[18]  The agencies therefore cannot meet their burden of showing that such documents were "created for the purpose of aiding the *agency's* deliberative process, as were the questionnaires in *Ryan*." *Dow Jones & Co., Inc.* v. *Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990) (emphasis in original).   The district court below determined that a general statement in an agency declaration that the agency had "sought feedback from Congress" was capacious enough to include any back-and-forth communications, because Executive and Legislative Branch decision-making processes about health care reform were "intertwined." JA 614–18 (internal quotation marks and citations omitted).  But even if some individual communications involved an agency requesting specific information from congressional staff, they cannot serve as a fig leaf broad enough to cover all of the rest—and still comport with the principle that the consultant corollary involves an outside party acting "just as an employee would be expected to do." *Klamath*, 532 U.S. at 11.  On the

---

[18] Some of the documents that were produced further evidence the tenor of this relationship.  For example, in one e-mail, an HHS employee asks a Hill staffer if the HHS employee can represent the HHS Secretary at a "daily war room" meeting on health care reform "being run out of the Majority Leader's Office." JA 317.  The reply:  "You and . . . the Secretary have been incredibly helpful to us in this process and I want to keep you very looped." *Id.*

38

record before this Court, the agencies worked, at least in part, to assist and to influence Congress.  Deeming congressional staff "consultants" to the agencies in these circumstances would expand the teachings of *Ryan* beyond recognition.

## II.   HHS FAILED TO CONDUCT AN ADEQUATE SEARCH

In addition to its failure to properly disclose congressional communications, HHS also neglected to conduct an adequate search.  An agency bears the burden of showing "beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Ancient Coin Collectors Guild* v. *U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal citations omitted).  The adequacy of the search is judged by a "standard of reasonableness" and depends upon the facts of each case.  *Weisberg* v. *U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  Here, in searching for records "relating to health care reform," JA 32, HHS used only three search terms: "ACA," "AHCA," and "health care reform."   JA 122–23 ¶¶ 16–17.  Because HHS failed to include commonly used and obvious alternatives—such as "Obamacare," "repeal and replace," "Affordable Care Act," and "American Health Care Act"—

the record leaves "substantial doubt as to the sufficiency of the search." *Truitt* v. *Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

This Court has long characterized an agency's burden to require it to "establish[] that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation." *McGehee* v. *CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983). Applying this requirement to the context of search terms, numerous district courts within this Circuit have found agencies' searches inadequate where they failed to use known alternative names or obvious synonyms for the subject of a request. *See, e.g.*, *Utahamerican Energy, Inc.* v. *Mine Safety & Health Administration*, 725 F. Supp. 2d 78, 84 (D.D.C. 2010).

For example, searches have been deemed inadequate where an agency searched "Pennsylvania State University" but not "PSU" or "Penn State," *Bagwell* v. *U.S. Dep't of Justice*, 311 F. Supp. 3d 223, 229–30 (D.D.C. 2018) (Cooper, J.); where an agency searched for "ideological tests" but not proxies or synonyms for those words, such as "politics," "values," "evaluation," screening," or "vetting," *Government Accountability Project* v. *U.S. Dep't of Homeland Security*, 335 F. Supp.

3d 7, 11 (D.D.C. 2018) (Cooper, J.); and where agencies searched for "FBI" within 50 words of "headquarters" but not for "Hoover Building" or "JEH," *American Oversight* v. *U.S. General Services Administration*, Case No. 18-2419, 2020 WL 1911559, at \*7–8 (D.D.C. Apr. 20, 2020) (Kollar-Kotelly, J.); *American Oversight* v. *Office of Management & Budget*, Case No. 18-2424, 2020 WL 1536186, at \*4–5 (D.D.C. Mar. 31, 2020) (Friedrich, J.) (similar).  As one court explained, "[p]art of liberally construing a request is searching for synonyms and logical variations of the words used in the [FOIA] request; an agency may not fish myopically for a direct hit on the records using only the precise phrasing of the request."  *Citizens for Responsibility & Ethics in Washington* v. *U.S. General Services Administration*, Case No. 18-377, 2018 WL 6605862, at \*5 (D.D.C. Dec. 17, 2018) (internal quotation marks and citation omitted). Or, more pithily:   "FOIA requests are not a game of Battleship." *Government Accountability Project*, 335 F. Supp. 3d at 12.

Under this rule, a search drawing the line between "ACA" and "AHCA" on one hand and "Affordable Care Act" and "American Health Care Act" on the other, and omitting common-sense terms like "Obamacare" and "repeal and replace," cannot be deemed a "reasonably

thorough" effort to locate all communications related to "health care reform." *See McGehee*, 697 F.2d at 1101.  In reviewing the Magistrate Judge's recommendations for clear error, the district court erred in its conclusion that an agency is not required to even claim, much less prove, that at least some of the unused search terms are used less frequently than the search terms that were employed.  JA 603.  And the district court turned the agency's burden on its head by focusing on the evidence underlying American Oversight's claims as to the existence of other potentially responsive documents, rather than the reasonableness of HHS's search on its face.  *See* JA 603–04.

HHS's efforts to take refuge in its affidavit are unavailing.  At best, HHS's declaration states that using the abbreviations "ACA" and "AHCA" "made sense . . . because they are frequently used[19] in the day-

---

[19] The district court's determination that the Magistrate Judge had not clearly erred in approving HHS's decision to "search the most common forms of reference used in the day-to-day operations of the Department" was incorrect.  JA 603 (internal quotation marks and citation omitted). HHS's declarant did not state that the search terms it used were "the most common forms of reference"; he stated only that the terms "ACA" and "AHCA" were "frequently used" as opposed to "Affordable Care Act" and "American Health Care Act."  JA 122 ¶ 16.  He did not state whether the terms "ACA" and "AHCA" were used more or less frequently than "Obamacare" or "repeal and replace," and so there was no basis on which

to-day operations of the Department, as opposed to the unabbreviated versions," and that "[i]t is reasonably likely that the use of more general terms would have resulted in an excessive number of records that would have been labeled 'potentially responsive,' . . . without a meaningful increase in the likelihood of identifying additional records that were actually responsive." JA 122 ¶ 16. Even affording the declaration a presumption of good faith, *see SafeCard Services, Inc.* v. *SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), it fails to establish that the unabbreviated "Affordable Care Act" or "American Health Care Act" were *not* used in communications with Congress, and it does not address the terms "Obamacare" or "repeal and replace" at all. The declaration simply asserts, without explanation, that it is "reasonably likely" that documents hitting on "more general terms" would be largely unresponsive. JA 122 ¶ 16. To the extent "Obamacare" or "repeal and replace" are "more general terms" at all, this is a perplexing statement: it is difficult to imagine a communication between an HHS employee and a congressional staffer that included the term "Obamacare" but was *not*

---

the Magistrate Judge (or district court) could find that HHS searched the terms most commonly used within HHS.

related to health care reform, the subject of the FOIA request. But the HHS declarant does not provide further explanation. "[W]ithout more, the speculation that the search terms may result in some unresponsive results is not a sufficient reason to exclude the search terms." *American Oversight*, 2020 WL 1911559, at *8.

Furthermore, even if the contents of HHS's declaration were sufficient on their face—which they are not—American Oversight has introduced evidence to cast them into reasonable doubt. Agency records show that HHS employees, Members of Congress, and congressional staff all used the terms HHS neglected to search. *See, e.g.*, JA 470, 474–75, 476, 481–82. The district court erred in holding this evidence insufficient. The court stated that, because these documents also contained the search terms used, they did not present "significant evidence" that other documents would contain only the new terms. JA 603–04. The test the district court applied, however, is untenable. Under this logic, FOIA requesters would be stuck in a permanent catch-22: by definition, the produced documents also included the searched terms or they would not have been produced. That fact thus proves nothing and should not be used as evidence of the sort of documents that may have

44

evaded the initial search (and were therefore beyond the ability of the requester to cite). Put differently, American Oversight cannot show this Court a non-public communication between HHS and Congress in which "Obamacare," "repeal and replace," "American Health Care Act," or "Affordable Care Act" appears, but "health care reform," "ACA," or "AHCA" do not—precisely because HHS has only searched for and produced documents including the latter terms. Endorsing this approach would create an unrebuttable presumption as to the adequacy of an agency's search.

American Oversight likewise introduced transcripts of public statements in which then-HHS Secretary Tom Price and Members of Congress used the terms "Obamacare" and "repeal and replace." *See, e.g.*, JA 345, 358, 369, 389, 415, 428, 429. District courts have found that this kind of evidence—demonstrating that an agency's interlocutors use a proposed search term—can effectively demonstrate that an agency's search is inadequate. *See American Oversight*, 2020 WL 1911559, at *7. But the district court below rejected that evidence, concluding that "there is nothing unreasonable in HHS choosing to search the most common forms of reference" used in the agency's daily operations, because HHS

was communicating with those interlocutors "as part of its operations." JA 603. Beyond the fact that there is no evidence that the search terms HHS employed were in fact the "most common" terms for daily internal use, *see supra* p. 42 n.19, the logic is flawed. Because American Oversight's FOIA request specifically sought communications with congressional staff, it is plausible—and even likely—that those interlocutors communicated with HHS using the most common terms in *their* daily usage. And if HHS personnel responded by mirroring their interlocutor's language, or even with a short response that need not hit on any of the search terms at all, the document would not be captured by the search HHS chose to conduct. HHS has failed to carry its burden to show otherwise.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Date: February 13, 2023     Respectfully submitted,

/s/ Jessica Anne Morton

Jessica Anne Morton
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org

Katherine M. Anthony
Mehreen A. Rasheed
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-3918
katherine.anthony@americanoversight.org
mehreen.rasheed@americanoversight.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,
## AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 9,337 words, as determined by the word-count function of Word for Microsoft 365.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Century Schoolbook.

*/s/ Jessica Anne Morton*
Jessica Anne Morton

48

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, I caused the foregoing brief and accompanying Joint Appendix to be electronically filed with the Clerk of Court using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

*/s/ Jessica Anne Morton*
Jessica Anne Morton