NOT YET SCHEDULED FOR ORAL ARGUMENT

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

## No. 22-5281

AMERICAN OVERSIGHT,

*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, *et al.*,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court for the District
of Columbia, No. 17-827, Honorable Emmet G. Sullivan, Judge.*

## BRIEF OF *AMICUS CURIAE* CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON IN SUPPORT OF APPELLANT

NIKHEL S. SUS
CITIZENS FOR RESPONSIBILITY
 AND ETHICS IN WASHINGTON
1331 F Street, NW, Suite 900
Washington, DC 20004
Tel.: (202) 408-5565

*Counsel for Amicus Curiae*

February 17, 2023



**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.     Parties and *Amici***

Except for *amicus* Citizens for Responsibility and Ethics in Washington ("CREW") and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellant's Brief, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in Appellant's Brief.

**B.     Rulings Under Review**

Reference to the ruling under review appears in Appellant's Brief.

**C.     Related Cases**

No related cases are referenced in Appellant's Brief, and counsel for CREW is aware of none.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, CREW certifies that it has no parent company, and no publicly held corporation has a 10% or greater ownership interest in it.

## RULE 29 STATEMENT

No counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than *amicus* or its counsel contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(e).

All parties have consented to the filing of this brief. *See* Cir. R. 29(b).

Pursuant to Circuit Rule 29(d), undersigned counsel certifies that a separate brief is necessary to address the perspective of CREW, a government watchdog organization that frequently requests federal records under the Freedom of Information Act ("FOIA") and brings litigation to enforce those requests. CREW's brief draws on its deep FOIA litigation experience and conveys its unique perspective on why this Court should not expand its "consultant corollary" doctrine to agency communications with Congress. Because other *amici* intend to address different issues from a different perspective, filing a single brief would not be practicable.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

RULE 29 STATEMENT ...................................................................................... iii

TABLE OF CONTENTS...................................................................................... iv

TABLE OF AUTHORITIES ................................................................................ v

INTEREST OF *AMICUS CURIAE*.......................................................................1

SUMMARY OF ARGUMENT .............................................................................1

ARGUMENT .........................................................................................................4

I.    FOIA's Text And Recent Supreme Court Precedent Caution Against
      Expanding The Atextual Consultant Corollary Doctrine...............................4

II.   The Consultant Corollary Does Not Apply In This Case ...............................6

      A.    The Congressional Communicators Were Not Neutral
            Consultants .............................................................................................6

      B.    The District Court's "Common Interest" Variant Of The
            Consultant Corollary Is Incompatible With *Klamath* And
            Other Precedent ....................................................................................12

III.  The District Court's Standard Rests On Flawed Premises, Has
      No Logical Limit, And Would Perversely Incentivize Partisan
      Policymaking.................................................................................................17

CONCLUSION....................................................................................................19

CERTIFICATE OF COMPLIANCE....................................................................21

CERTIFICATE OF SERVICE .............................................................................22

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Am. Mgmt. Servs., LLC v. Dep't of the Army*,
   703 F.3d 724 (4th Cir. 2013) ..................................................................13

*Am. Oversight v. Dep't of the Treasury*,
   474 F. Supp. 3d 251 (D.D.C. 2020) ................................................. 12, 15

*Am. Oversight v. Dep't of Transp.*,
   No. 18-cv-1272, 2022 WL 103306 (D.D.C. Jan. 11, 2022) .......................... 12, 15

*Am. Oversight v. HHS*,
   380 F. Supp. 3d 45 (D.D.C. 2019) ..................................................... 7, 17

*CREW v. DOJ*,
   __ F.4th __, 2023 WL 1113218 (D.C. Cir. 2023) ...................................6

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*,
   670 F.2d 1051 (1981) ................................................................................4

*Dep't of State v. Ray*,
   502 U.S. 164 (1991) ..................................................................................4

*Dep't of the Air Force v. Rose*,
   425 U.S. 352 (1976) ..................................................................................4

*Department of Interior v.*
*Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001) ............................................... 1, 2, 3, 5, 6, 7, 8, 9, 10,
                                                        11, 12, 13, 14, 15, 16, 17

*Dow Jones & Co. v. DOJ*,
   917 F.2d 571 (D.C. Cir. 1990) ...................................................................6

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019) ..........................................................................4, 5

*Friends of the Earth v. U.S. Army Corps of Eng'rs*,
   374 F. Supp. 3d 1045 (W.D. Wash. 2019) ............................................16

*Hunton & Williams v. DOJ*,
   590 F.3d 272 (4th Cir. 2010) ..................................................................13

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998)...........................................................................13

*Judicial Watch, Inc. v. Dep't of Energy*,
    412 F.3d 125 (D.C. Cir. 2005)...........................................................................19

*Judicial Watch, Inc. v. Dep't of State*,
    306 F. Supp. 3d 97 (D.D.C. 2018).......................................................................12

*Lucaj v. FBI*,
    852 F.3d 541 (6th Cir. 2017)............................................................................14

*McKinley v. Board of Governors of the Federal Reserve System*,
    647 F.3d 331 (D.C. Cir. 2011) ........................................................... 7, 8, 9, 17

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) ......................................................................................4

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002)............................................................................4

*Nat'l Inst. of Mil. Just. ("NIMJ") v. DOD*,
    512 F.3d 677 (D.C. Cir. 2008)............................................... 5, 7, 8, 9, 16, 17, 19

*Nat'l Parks & Conservation Ass'n v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974)...........................................................................4

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
    596 F. Supp. 3d 130 (D.D.C. 2022) ....................................................................5

*People For The Am. Way Found. v. U.S. Dep't of Educ.*,
    516 F. Supp. 2d 28 (D.D.C. 2007)............................................................. 10, 16

*Public Citizen Inc. v. DOJ*,
    111 F.3d 168 (D.C. Cir. 1997)...........................................................................8

*Reps. Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ..........................................................................18

*Rojas v. FAA*,
    989 F.3d 666 (9th Cir. 2021) ...................................................................... 5, 14

*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980)...........................................................................8

*Pub. Emps. for Env't Resp. ("PEER") v.*
  *U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico,*
  740 F.3d 195 (D.C. Cir. 2014)................................................................ 5, 8, 15, 17

**Statutes and Other Authorities:**

5 U.S.C. § 552(b)(5)............................................................................................1

5 U.S.C. § 552(d) ...............................................................................................6

Cong. Research Serv., *Roles and Duties of a Member of Congress:*
  *Brief Overview*, Feb. 15, 2022 ..................................................... 10, 11

Press Release, *Wittman Announces Opposition to American Health Care Act,*
  Congressman Rob Wittman, Mar. 14, 2017 ..........................................11

## INTEREST OF *AMICUS CURIAE*

CREW is a nonprofit, nonpartisan organization dedicated to promoting integrity, transparency, and accountability in government. CREW seeks to protect the rights of citizens to be informed about the activities of government officials and to ensure the integrity of those officials. To that end, CREW frequently requests government records under FOIA and widely disseminates the records it obtains to the public. As a frequent FOIA requester, CREW has a strong interest in the application of Exemption 5's "consultant corollary" to agency communications with Congress.

## SUMMARY OF ARGUMENT

Exemption 5 of FOIA shields records that (1) are "inter-agency or intra-agency" and (2) would normally be privileged in civil discovery. 5 U.S.C. § 552(b)(5). Although neither Exemption 5's text nor the statutory definitions address agency communications with outsiders, this Circuit and some others have read a "consultant corollary" into the exemption, under which certain communications with non-agencies can be deemed "intra-agency." In *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001), the Supreme Court imposed strict limits on this doctrine, including that it cannot apply to outsiders "communicating with the Government in their own interest or on

behalf of any person or group whose interests might be affected by the Government action addressed by the consultant." *Id.* at 12.

The government now seeks to expand this Court's post-*Klamath* consultant corollary doctrine to a new terrain: communications with Congress. At summary judgment, the District Court held that certain agency communications with Congress were "intra-agency" under the consultant corollary because they involved "members of Congress and congressional staff of the Republican Party who shared an interest with agencies in the current Republican administration in working to repeal the [Affordable Care Act] and replace it with the health care reform legislation that was under consideration." Joint Appendix ("JA") 609.

The District Court erred. Under *Klamath* and Circuit precedent, the consultant corollary can only apply to neutral outsiders who represent no independent interests—*i.e.*, someone who is "enough like the agency's own personnel to justify calling their communications 'intra-agency.'" *Klamath*, 532 U.S. at 12. Members of Congress and their staff do not fit this mold. Unlike the typical agency consultant, congressional communicators represent their own interests, those of their constituents, and those of Congress when interacting with agencies on proposed legislation. These independent interests disqualify them from being deemed "intra-agency" actors under the consultant corollary.

2

Despite acknowledging that the congressional communicators had independent interests, the District Court deemed them "intra-agency" consultants because they shared a "common interest" with Republican officials in the Trump administration in repealing and replacing the Affordable Care Act. But neither this Circuit nor any other has adopted such a "common interest" variant of the consultant corollary. And that is for good reason: it "skips a necessary step" by "ignor[ing] the first condition of Exemption 5, that the communication be 'intra-agency or inter-agency,'" *Klamath*, 532 U.S. at 12, and would shield communications based solely on Exemption 5's second condition, that they would normally be privileged in civil discovery.

Apart from its legal flaws, the District Court's standard rests on the faulty premise that agency and congressional officials of the same political party have aligned interests. Political-party alignment is not a good proxy for interest alignment, as the attempts to repeal the Affordable Care Act aptly demonstrated. The District Court's standard also has no logical limit—it could conceivably extend Exemption 5 to communications with *any* politically-aligned individual outside of the Executive Branch. Finally, selectively shielding inter-branch communications between members of the same political party would only increase partisanship in federal policymaking. This would impair, not improve, the quality of government decision-making—precisely what Exemption 5 is meant to prevent.

3

# ARGUMENT

## I.   FOIA's Text And Recent Supreme Court Precedent Caution Against Expanding The Atextual Consultant Corollary Doctrine

Any attempt to expand this Court's consultant corollary doctrine faces two hurdles out of the gate. First, "[a]t all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure,' and that the statutory exemptions, which are exclusive, are to be 'narrowly construed.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)). This rule applies to Exemption 5 and its consultant corollary.

Second, the Supreme Court has in recent years rejected atextual FOIA exemption doctrines established by this Circuit and widely followed in the Courts of Appeals. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (rejecting "substantial competitive harm" test for Exemption 4 established in *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)); *Milner v. Dep't of Navy*, 562 U.S. 562, 569–73 (2011) (rejecting "High 2 test" for Exemption 2 established in *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (1981) (en banc)). Such doctrines are "relic[s] from a 'bygone era of statutory construction.'" *Argus Leader*, 139 S. Ct. at 2364.

4

The consultant corollary is such a relic. *See Rojas v. FAA*, 989 F.3d 666, 683 (9th Cir. 2021) (Wardlaw, J., concurring in part and dissenting in part) (asserting that the "atextual 'consultant corollary' doctrine" is unsupported by Exemption 5's text and, like the substantial competitive harm test, originated from a "D.C. Circuit case from the early 1970's" that reflects a "bygone era of statutory construction" (quoting *Argus Leader*, 139 S. Ct. at 2364)); *Nat'l Inst. of Mil. Just. ("NIMJ") v. DOD*, 512 F.3d 677, 687–96 (D.C. Cir. 2008) (Tatel, J., dissenting) (similar); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 596 F. Supp. 3d 130, 141 (D.D.C. 2022) (refusing to extend the "atextual" consultant corollary).

For its part, the Supreme Court in *Klamath* acknowledged that "neither the terms of [Exemption 5] nor the statutory definitions say anything about communications with outsiders," 532 U.S. at 9, yet the Court "assum[ed] without deciding that the consultant corollary was valid," *Pub. Emps. for Env't Resp. ("PEER") v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 201 (D.C. Cir. 2014).

The consultant corollary remains the law of this Circuit. But given the need to narrowly construe FOIA exemptions and the Supreme Court's repeated disapproval of atextual FOIA doctrines, this Court should not expand it. It would be especially inappropriate to extend the doctrine to *Congress*, since Congress easily could have specified in FOIA that communications with it are "inter-

5

agency" or "intra-agency," but it did not do so. *See Dow Jones & Co. v. DOJ*, 917

F.2d 571, 574 (D.C. Cir. 1990) ("It may well be true that if Congress had thought

about this question, the Exemption would have been drafted more broadly to

include Executive Branch communications to Congress. … But Congress did not,

and [Exemption 5's] words simply will not stretch to cover this situation."); *accord*

*CREW v. DOJ*, __ F.4th __, __, 2023 WL 1113218, at *5 (D.C. Cir. 2023).[1]

## II.     The Consultant Corollary Does Not Apply In This Case

### A.     The Congressional Communicators Were Not Neutral Consultants

**1.** *Klamath* held that the consultant corollary—assuming it were valid—

cannot extend to non-agencies "communicating with the Government in their own

interest or on behalf of any person or group whose interests might be affected by

the Government action addressed by the consultant." 532 U.S. at 12. The Court

distinguished interested outsiders from the "typical" agency consultant, who

"functions just as an [agency] employee would be expected to do," "does not

represent an interest of its own, or the interest of any other client, when it advises

the agency that hires it," and whose "only obligations are to truth and its sense of

what good judgment calls for." *Id.* at 10–11. The Court held that the non-agency

---

[1] Congress demonstrated elsewhere in FOIA that it knew how to protect its own
interests when it so desired. *See, e.g.*, 5 U.S.C. § 552(d) ("This section is not
authority to withhold information from Congress.").

communicators in *Klamath*—Indian tribes who had consulted with the Department of Interior regarding their water allocation interests—did not fit the consultant paradigm because they were communicating with "their own … interests in mind." *Id.* at 12. And the fact that the tribes were acting as "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone" made the "distinction" between the tribes and the typical consultant "even sharper." *Id.*

Since *Klamath*, this Circuit has "consistently reiterated the principle that the outside consultant must be a neutral party who is not representing its own interests." *Am. Oversight v. HHS*, 380 F. Supp. 3d 45, 54 (D.D.C. 2019) (surveying cases). In *NIMJ*, the Court held that the consultant corollary applied to the Department of Defense's communications with private experts about establishing terrorist trial commissions because, "[u]nlike the Indian tribes in *Klamath*," the experts "had no individual interests to promote in their submissions." 512 F.3d at 683. The Court contrasted the experts' submissions with those of organizations such as Human Rights Watch and the American Bar Association who had "an interest in these matters" and for whom the agency did not invoke Exemption 5. *Id.*

In *McKinley v. Board of Governors of the Federal Reserve System*, the Court held that the Federal Reserve Bank of New York (a non-agency) acted as a consultant to the Board of Governors of the Federal Reserve System (an agency) because it "[did] not represent an interest of its own, or the interest of any other

7

client, when it advise[d] the [Board]" to approve a loan. 647 F.3d 331, 337 (D.C. Cir. 2011) (quoting *Klamath*, 532 U.S. at 11) (alterations in original). The Court stressed that the bank was an "'operating arm' of the Board." *Id.* Moreover, "[s]tatutes, regulations and case law ma[d]e clear … that the Board and the Reserve Banks share[d] a common goal" of maintaining a "sound and orderly financial system," both the board and bank were working toward that statutorily-defined goal with respect to the loan at issue, and there was no indication that their "interests diverged in deciding to make the loan." *Id*.

Most recently, in *PEER*, the Court stated "[i]n the wake of *Klamath*, we have confined the consultant corollary to situations where an outside consultant did not have its own interests in mind," 740 F.3d 195, 201–202 (citing *McKinley*, 647 F.3d at 336–37), though the Court had no occasion to apply this standard because factual issues required remand.[2]

---

[2] Two pre-*Klamath* cases suggest that an independent interest on the part of the consultant is not disqualifying. *See Public Citizen Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997); *Ryan v. DOJ*, 617 F.2d 781 (D.C. Cir. 1980). But *Klamath* called those holdings into question because they "arguably extended beyond" typical examples of the consultant corollary. *See* 532 U.S. at 12 n.4 (noting the former presidents in *Public Citizen* "had their own, independent interests" and in *Ryan*, the senators' questionnaire responses were held exempt "even though we would expect a Senator to have strong personal views on the matter"). The Circuit has recognized this tension but declined to resolve it. *See NIMJ*, 512 F.3d at 685. This Court can and should clarify that *Klamath* superseded earlier cases to the extent they held that the consultant corollary can apply to consultants with independent interests. *See id.* at 691 (Tatel, J., dissenting).

None of these cases delineated what degree of independent interest, if any, might be tolerable, because the outsiders had no such interests. *See NIMJ*, 512 F.3d at 685 ("[T]here is no dispute that the individuals [the agency] consulted were not pursuing interests of their own so as to run afoul of *Klamath's* concern."); *McKinley*, 647 F.3d at 337 (consultant had no "diverge[nt] … interest"). While the case law does not answer this question, *Klamath* establishes a benchmark: the "'typical' outside agency consultant[]." *NIMJ*, 512 F.3d at 683.

The typical consultant is not "devoid of a definite point of view when the agency contracts for its services." *Klamath*, 532 U.S. at 10. But it also "does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it. Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id.* at 11; *see also id.* at 12 (typical consultants "have not been communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant. In that regard, consultants may be enough like the agency's own personnel to justify calling their communications 'intra-agency.'").

**2.** The congressional communicators here were not neutral parties akin to the "typical" agency consultant. Instead, as the District Court acknowledged, they

brought some "divergent interest to bear." JA 608. Unlike the typical consultant who represents no independent interests, Members of Congress (and, by extension, their staff) represent their own interests, those of their constituents, and those of Congress as an institution. When communicating with agencies about draft legislation, Members of Congress and their staff are not acting as neutral advisers aiding agency deliberations "just as an [agency] employee would be expected to do." *Klamath*, 532 U.S. at 11. They are political actors from a separate branch of government who have duties, interests, and concerns distinct from those of unelected agency officials in the Executive Branch. *See People For The Am. Way Found. v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28, 38 (D.D.C. 2007) (deeming consultant corollary inapplicable to agency communications with D.C. Mayor's Office partly because that office "represents its own constituency of schools and citizens").

According to the Congressional Research Service, "the roles and duties carried out by a Member of Congress are understood to include representation, legislation, and constituent service and communication, as well as electoral activities." Cong. Research Serv., *Roles and Duties of a Member of Congress: Brief Overview*, at 1, Feb. 15, 2022, https://bit.ly/3DWYAQG. These roles are "an outgrowth of Member priorities based on the expectations of constituents and broader publics, and congressional institutional expectations." *Id.* at 2. "When

10

considering new legislation … , the opinion of their constituency often may be uppermost in a Member's mind." *Id.* at 3. "In developing and debating legislative proposals, Members may take different approaches to learn how best to represent and advance the interests of their district or state, and the nation." *Id*. Ultimately, "the degree to which each [duty] is carried out differs among Members as they pursue the common goals of seeking reelection, building influence in Congress, and making good public policy." *Id.* at 5. Given this multitude of interests, congressional representatives and staff are a "far cry from the position of the paid [agency] consultant." *Klamath*, 532 U.S. at 15.

The record in this case proves the point. It reflects communications and meetings with Republican Members of Congress who opposed the healthcare reform legislation supported by Trump administration officials and other Republican Members of Congress. *E.g.*, JA 314; *see also* JA 113 (describing emails between the Trump Administration and Congress discussing "areas where they agreed and sources of ongoing disagreement"). Republican Congressman Rob Wittman cited his constituents' interests in announcing his opposition to the bill, stating "I do not think this bill will do what is necessary for the short and long-term best interests of Virginians and therefore, I must oppose it." Press Release, *Wittman Announces Opposition to American Health Care Act*, Congressman Rob Wittman, Mar. 14, 2017, https://perma.cc/U6LJ-ZBNX; *see* JA 74, 275–76 ¶ 25

11

(describing redacted email chain regarding Representative Wittman's announcement).

There is no dispute that the congressional communicators in this case represented their own interests, those of their constituents, and those of Congress when interacting with the agencies. This alone disqualifies them from being deemed "intra-agency" actors under the consultant corollary and *Klamath*.

**B.    The District Court's "Common Interest" Variant Of The Consultant Corollary Is Incompatible With *Klamath* And Other Precedent**

The District Court acknowledged that the congressional communicators had independent interests. JA 608 (recognizing that if a non-agency "must bring *no* divergent interest to bear, then the records at issue would lose their Exemption 5 protection"). But the court held—citing only non-precedential authority—that those interests did not preclude application of the consultant corollary because the agency and congressional communicators had a "common interest" in repealing and replacing the Affordable Care Act. JA 607–09 (citing *Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 111 (D.D.C. 2018); *Am. Oversight v. Dep't of the Treasury*, 474 F. Supp. 3d 251, 265 (D.D.C. 2020); *Am. Oversight v. Dep't of Transp.*, No. 18-cv-1272, 2022 WL 103306, at *1 (D.D.C. Jan. 11, 2022)).

Neither this Circuit nor any other has recognized any such "common interest" variant of the consultant corollary. For good reason: the test collapses

12

Exemption 5's first requirement (that the record is "inter-agency" or "intra-agency") into its second (that it would be privileged in civil discovery).

Indeed, the "common interest doctrine" is a common law rule through which litigation privileges, such as the attorney-client privilege and work product doctrine, can extend to third parties. *See In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998). Because it is part of the law of privilege, the doctrine "relates only to the *second* condition of [E]xemption 5, that is, the communication 'must fall within the ambit of a privilege against discovery.'" *Hunton & Williams v. DOJ*, 590 F.3d 272, 290–91 (4th Cir. 2010) (Michael, J., dissenting) (quoting *Klamath*, 532 U.S. at 8) (emphasis added). Yet "[s]atisfaction of [Exemption 5's] second condition cannot serve as automatic satisfaction of the first condition." *Id.* "As the Supreme Court emphasized in *Klamath*, there is 'no textual justification for draining the first [intra-agency] condition of independent vitality…'" *Id.* (quoting at *Klamath*, 532 U.S. at 9). Reading Exemption 5's intra-agency prong to incorporate a "common interest" doctrine would do just that. *Id.*

Only one Court of Appeals has read the common interest doctrine into Exemption 5, and it has articulated requirements for the doctrine that indisputably are not met here. *See Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 732–33 (4th Cir. 2013) ("[F]or the common interest doctrine to apply in the context of Exemption 5, 'an agency must show that it had agreed to help another

13

party prevail on its legal claims at the time of the communications at issue because doing so was in the public interest.' … [T]here must be an agreement or a meeting of the minds. '[M]ere indicia of joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed.'") (citations omitted). The common interest doctrine is distinct from the consultant corollary, though they are sometimes conflated. *See Lucaj v. FBI*, 852 F.3d 541, 547–49 (6th Cir. 2017) (rejecting both doctrines as inconsistent with *Klamath*).

The District Court applied a mixed version of the consultant corollary and common interest doctrines and, in the process, elided elements of both tests. *See* JA 607–09. It appears no Court of Appeals has adopted this hybrid standard. *See Rojas*, 989 F.3d at 686 (Wardlaw, J., concurring in part and dissenting in part) (surveying case law). This Circuit should not be the first. Instead, it should give effect to Congress's decision not to extend Exemption 5 to all "entities that share a common interest with agencies." *Lucaj*, 852 F.3d at 549; *see also Klamath*, 532 U.S. at 15–16 (declining to "read an 'Indian trust' exemption into" FOIA since there is "simply no support for the exemption in the statutory text, which we have elsewhere insisted be read strictly in order to serve FOIA's mandate of broad disclosure"); *supra* Part I.[3]

---

[3] Other district judges have held that the "relevant inquiry" for determining whether the consultant corollary applies to agency communications with Congress

14

Nor does the District Court's analysis comport with settled consultant corollary precedent. Under those cases, it is not enough for an outsider to *share* a common interest with the agency; it must *lack* an independent interest in the outcome of the agency's deliberations. *See PEER*, 740 F.3d at 201–202. Only then does the outsider fit the paradigm of the agency consultant, whose "*only* obligations are to truth and its sense of what good judgment calls for." *Klamath*, 532 U.S. at 11 (emphasis added).

Consider *Klamath*: there the Department of Interior and the Indian tribes surely shared some interests given the agency's "trust obligation" as a "fiduciary for the benefit of the Indian [t]ribes." *Id.*; *see also id.* at 5 (noting that the Department's Bureau of Indian Affairs is "responsible for administering land and water held in trust for Indian tribes" and submitted water-allocation claims on behalf of one tribe). Nonetheless, the consultant corollary did not apply to communications in which the tribes were acting "with their own … [water

---

is "whether the two staffs were 'working together' to achieve a common legislative purpose." *Am. Oversight v. Dep't of Transportation*, 2022 WL 103306, at *5 (quoting *Am. Oversight v. Treasury*, 474 F. Supp. 3d at 266). Here again, neither Exemption 5's text nor Circuit precedent support such a standard. And even courts that have adopted the standard recognize it is based on "a kind of legal fiction" and "may seem to stretch the consultant corollary doctrine beyond its bounds," since "[i]t is not the case that [c]ongressional staff, when coordinating common legislative goals, effectively become 'employees' functioning as 'just an employee would be expected to do.'" *Id.* at *6. "Rather, … [c]ongressional staff are employed for a separate, co-equal branch of government." *Id.*

allocation] interests in mind" and as "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* at 12. Similarly, in *NIMJ*, the Department of Defense presumably shared the goal of establishing "fair" and "effective[]" terrorist trial commissions, 512 F.3d at 683, with advocacy organizations such as the American Bar Association and Human Rights Watch. Yet the agency did not even invoke the consultant corollary as to those organizations because of their "interest in these matters." *Id. Klamath* and *NIMJ* reinforce that the consultant corollary requires not merely the presence of a common interest, but the lack of an independent interest. The outsider must be neutral, just as agency employees and paid consultants are expected to be.

The District Court further erred by misreading *Klamath* as only precluding application of the consultant corollary when the outsider's interests are "necessarily adverse" to its "competitors." JA 609. "[W]hile *Klamath* was narrowly decided on the grounds that the [t]ribes both [1] communicated with the Government in their own interest and [2] acted as self-advocates seeking benefits at the expense of others," *Klamath* does not stand for the "proposition that communications must definitively meet these two criteria to fall outside of Exemption 5." *People For The Am. Way Found. v. Dep't of Educ.*, 516 F. Supp. 2d 28, 38 (D.D.C. 2007) (emphasis added); *accord Friends of the Earth v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 3d 1045, 1054 n.6 (W.D. Wash. 2019). Rather,

16

*Klamath* indicated the consultant corollary would not have applied "[e]ven if there were no rival interests at stake," because the tribes would still "be pressing [their] own view of [their] own interest in [their] communications with the Bureau." 532 U.S. at 14. The tribes' interests "alone distinguish[ed] [their] communications from the consultant[] examples"; the fact that they acted "at the expense of others seeking benefits inadequate to satisfy everyone" simply made the "distinction … even sharper." *Id.* at 12.

Consistent with this reading, this Court's post-*Klamath* precedent indicates that a consultant's independent interest can by itself be disqualifying. *See PEER*, 740 F.3d at 201–202; *McKinley*, 647 F.3d at 337; *NIMJ*, 512 F.3d at 683; *see also Am. Oversight v. HHS*, 380 F. Supp. 3d at 54 ("[I]t appears that the law in this Circuit does require that outside consultants 'lack an independent interest.'").

## III.  The District Court's Standard Rests On Flawed Premises, Has No Logical Limit, And Would Perversely Incentivize Partisan Policymaking

The District Court emphasized the communicators' shared political party in approving application of the consultant corollary, reasoning "the redacted emails involve members of Congress and congressional staff of the Republican Party who shared an interest with agencies in the current Republican administration in working to repeal the [Affordable Care Act] and replace it with the health care reform legislation that was under consideration." JA 609 (quoting JA 109 ¶ 7).

17

Apart from its legal flaws, *see supra* Part II.B, the District Court's standard is untenable for several reasons.

First, it rests on the faulty premise that agency and congressional officials who share a political party have aligned interests, while members of opposing parties do not. Political-party alignment is not a good proxy for interest alignment—a point aptly demonstrated by the Republican opposition to the American Health Care Act. *See supra* Part II.A. Within each of the major political parties are a wide range of viewpoints and policy preferences. Members of the same party may not be aligned. Conversely, members of opposing parties may be aligned. This ideological diversity is especially present in Congress, where members represent distinct constituencies spread across the country.

Second, the District Court's reasoning has no logical limit. If congressional representatives of the same political party can be "intra-agency" consultants covered by Exemption 5, then what about politically aligned state and local government officials? Political party officials? Lobbyists? Advocacy groups? Media personalities? The possibilities for unduly expanding the scope of Exemption 5—which has long been subject to "agency overuse and abuse," *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021)—are boundless.

18

Finally, selectively shielding inter-branch communications between members of the same political party would only increase partisanship in federal policymaking. This follows from the animating rationale for Exemption 5—that confidentiality encourages the "full and frank exchange of ideas on legal or policy matters" with the goal of improving "the quality of administrative decision-making." *NIMJ*, 512 F.3d at 686 (quoting *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005)). Making same-party communications confidential would only encourage the free exchange of ideas between members of the same political party. The result would be more partisanship and less ideological diversity in inter-branch policy discussions. This would impair, not improve, the quality of government decision-making—precisely what Exemption 5 is designed to prevent.

## CONCLUSION

The judgment of the District Court should be reversed.

19

Dated: February 17, 2023                Respectfully submitted,

                                        /s/ *Nikhel S. Sus*
                                        Nikhel S. Sus
                                        CITIZENS FOR RESPONSIBILITY AND
                                        ETHICS IN WASHINGTON
                                        1331 F St. NW, Suite 900
                                        Washington, D.C. 20004
                                        (202) 408-5565
                                        nsus@citizensforethics.org

                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies the type-volume limitations of Federal Rules of Appellate Procedure 29(a) and 32(a) because this brief contains 4,438 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Nikhel S. Sus*
Nikhel S. Sus
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

Pursuant to Circuit Rule 25(c), I hereby certify that on February 17, 2023, I electronically filed the foregoing with the Court using the CM/ECF system. All parties have been served through the CM/ECF system.

*/s/ Nikhel S. Sus*
Nikhel S. Sus
*Counsel for Amicus Curiae*
